We're going to go on to case number 5, 23-1878, U.S.A. v. Anthony Bender. Good morning, Your Honors. Good morning. Good morning, Counsel. Good morning. If it please the Court, I would like to reserve five minutes for rebuttal. Okay. You just watch that clock, okay? Thank you, Your Honor. All right. My name is Bart Beals. I am on behalf of the appellant, Mr. Bender. I just want to touch on a couple things really quickly. The first issue is to raise the insufficiency of evidence in this case, whereas I understand that it is a very high burden. In this case here, there was a trial where my client was charged with possession of a firearm by a felon or a prohibited person under the 922G. Now, during the trial, the main evidence was the testimony of the state trooper, and there was an actual video, dash cam video of the actual event. Now, just to back up a little bit to give the information, my client was not the driver of the vehicle. He was in a vehicle where there were at least two other individuals in that vehicle. That vehicle that was being driven by someone else was initially, it was an attempt to stop that vehicle by local law enforcement. The vehicle did not stop, and it went, it drove into a bank parking lot in the Kentucky area. During the process of the, as is characterized as a chase, although it wasn't an extremely high-speed chase, but it was a chase, the state trooper joined in to assist the local law enforcement, and in the process of assisting the local law enforcement, the vehicle stopped. One individual jumped out of the vehicle that the local law enforcement gave chase to, and my client jumped out of the vehicle, and the state trooper gave chase to. Now, the entire time that my client exited the vehicle and to the point that my client was taken into custody by the state trooper, that entire encounter was captured on the dash cam. And at no point during the dash cam was it, you know, obviously visible that my client was in the possession of a firearm with an extended clip. Now... Why could no reasonable juror find Harcey's testimony credible? Why would that be? They saw the video as well. That is correct, Your Honor, and the reason why, in the view of the defense, that no reasonable jury could have found the state trooper's testimony to be credible is because of the actual firearm. If the firearm would have been, let's say, a .380 caliber, which is commonly referred to as a 9mm short in Europe, it's here, it's called a .380. These tend to be smaller firearms. If it had been a small firearm, a .22 or something like that, but we're talking about a firearm that actually had an extended clip. So the clip itself had an extended area beyond the actual handle of the firearm. Couple that with the fact that my client was wearing a T-shirt and was wearing some khaki, like, sweatpants. Without a holster, you know, I guess the officer can testify, and it's understandable, but at some point you have to give way to some level of science here. And to say that somehow this firearm, where the entire encounter was captured on video, where my client was running from one vehicle, ran through a short area of a parking lot, jumped a fence more than once, and at no point was the firearm visible. At no point did the firearm fall. The jury was allowed to watch the video more than once. Weren't they also allowed to hear Trooper Hardy's testimony, and would they have had to have found Trooper Hardy credible? Yes, they would have had to have found him credible, but the issue in this situation is the finding the officer's testimony credible in light of the actual objective evidence. You have subjective evidence, i.e. testimony, and then you have objective evidence that you can see in an actual video the actual event captured. And it's the video when he jumps back over the fence where you can't see his hands is where Trooper Hardy testifies what's occurring in the part that we can't see. Is that my testimony? Well, Trooper, and I understand I'm going past the five minutes, but I will answer the court's question. Thank you. The video actually showed my client jumped the fence more than once. The last time he jumped the fence, the video showed my client. It actually, the jury was, they were able to actually view the video. They were able to slow it down, rewind it. And in the video, you can see my client's hands. You can? You can see his hands. The actual, the officer's hands. Doesn't his hand go out of the frame at the exact moment that Harcy said that Bender tossed the gun? And of course, it all occurred at night. It's dark. Well, it did occur at night, but it was in the parking lot where there was lighting. So it was well lit enough where you can see my client. You can see his hands. Now, yes, the officer's testimony was that when my client jumped over the fence for, I think, the second time, that when he landed, when he jumped over the fence, when he landed, his hands, because he crouched down, his hands were below the actual camera. However, according to the trooper's testimony, my client reached across his waistband, grabbed the firearm out, and then threw it in one consistent motion. The video, which was viewed more than one time by the jury, showed my client jumping over the fence where you don't see him reaching for anything. And when he, the brief period of time when he crouches down below where the dash cam shows, he had not reached for anything in his waistband, and he did not have a firearm in his hands at that time. So he was below the camera level briefly, jumped back up, and started to run. Even by the time he jumped back up and started to run, then he ran outside of where the camera can show. Then he gets tased almost immediately, right? He gets tased outside. You can see the officer is getting his taser out. It doesn't show him being tased. On the dash cam, you can see him chasing my client and trying to deploy the taser at that point. But at that point, my client is in front of the officer. The officer is behind him as he's trying to tase him. And there's still, at no point do you see a firearm in my client's hand. So whereas I do understand that it is a high standard, nonetheless, the government is required to prove beyond a reasonable doubt. And the video in the position of the defense impedes the officer's testimony. It looks as if I'm well past my five minutes, but if there are any other questions. Thank you. Thank you. Hello, Your Honors. May it please the Court. I'm Scott Simpson on behalf of the United States. On all of the defendant's challenges here, their enemy is the standard of review. It's already been referred to here. That's especially true on the sufficiency of the evidence. The defense has to show that there's no evidence on which the jury could have found him guilty, and that's just impossible here. The jury heard Troup. If Harshi's testimony had been successfully impeached with Hosselton's video evidence, would Bender's conviction still stand? And on what evidence? Well, Your Honor, I'll refer to that a bit more in relation to the Brady claim. But the district court found that it was virtually impossible for Trooper Hosselton's dash cam video to show the gun on the pavement. And really, this again is getting more into the Brady claim. Really, I think there's no dispute here that there was a gun on the pavement. The dispute is how it got there. So even if Trooper Hosselton's dash cam had showed the gun on the pavement, that wouldn't have resolved anything. The question was how it got there, and that is based on the jury's findings in that regard, are based on Trooper Harshi's testimony and on viewing the video a number of times. Besides testifying, Trooper Harshi testified that he found the gun on the other side of his patrol car after securing Mr. Bender. He also testified that he saw Mr. Bender toss the gun and that he heard it hit the pavement and he heard it slide under the patrol car. If that didn't happen, the only way to discount, to reject that testimony, to reject that, is to find that Trooper Harshi lied. Obviously, the jury didn't find that. Obviously, the jury believed Trooper Harshi's testimony. And of course, the jury is responsible for assessing credibility, for assessing all the evidence, especially for making credibility calls. Mr. Simpson, what would the angle of Trooper Hosselton's dash cam video have been, and would it have been low enough, presumably, to display what Trooper Harshi testified to in terms of the gun being tossed? What the district judge here said, Your Honor, in making that factual finding, is he said, and I'm certainly paraphrasing here, he said that Trooper Hosselton had to have, I think he said, driven through the church's fence. And the reason for that is there was a, this is the area where Mr. Bender ran through. He jumped over the fence into this enclosed area. He ran around in there a little bit more. Then he jumped out. And when Trooper Harshi pulled into the area, he pulled in facing that fence, pretty much, I think, in the middle of that enclosed area. And so when the district judge said for Mr. Trooper Hosselton's camera to show the gun on the ground, he would have had to have driven through that fence. I think that's based on the position of the fence and the position of Trooper Harshi's patrol car. So I think what the district judge was saying is Trooper Hosselton was simply coming in down that alley. And so since the dash cam, there is testimony, in fact, that the dash cam points forward. Since the dash cam was pointing forward, it wouldn't have shown, the district judge found, it would not have shown the gun on the ground, or it's virtually impossible, is what the judge said. It wouldn't have shown the gun on the ground. But, again, even if it had shown, and this, again, goes back to Judge Roeder's question, even if it had shown the gun on the ground, there was no dispute that there was a gun on the ground. The dispute is how it got there. And, again, what the district judge said is because of the position of all these things, as we've talked about, and the timing of Trooper Hosselton's arrival, he didn't arrive until Trooper Hosselton testified. He didn't arrive until Mr. Bender was in Trooper Harsey's patrol car. The gun was still on the ground. Trooper Hosselton said he saw the gun on the ground. So, number one, because of the position of everything, and number two, the timing of Trooper Hosselton's arrival, that's why the district judge said it would be virtually impossible for the gun, for Trooper Hosselton's dash cam to show anything. Can we go back a little bit? We talked about the standard of review and kind of the way that this case has been positioned for our review. One of the things, Zant, sufficiency of the evidence, I think both sides have hit on. It's almost insurmountable. And so we're told that we're not to re-weigh the evidence, reassess. Those things are done by the jury. However, when the laws of nature make it impossible for the facts to fall out the way that they have to, to be able to believe Trooper Harsey, going back to the video itself, this concept or this idea that within less than a split second, this individual while jumping over a fence, bracing himself, coming over the fence, have the opportunity to reach across, pull and throw within that second, that his hands are not seen in the video, that the laws of nature will contradict that. Your Honor, I suppose there could be a case where it would be very obvious that the laws of nature would, that a jury's finding, although this would be an extreme case, I suppose it would be possible for the jury's finding to violate the laws of nature, but that certainly is not this case. As we've already referred to during the prior argument, the dash cam video didn't show Mr. Bender's hands. They were below the frame of the dash cam. How long were his hands below the dash cam? Seconds or less. It was very fast. I should point out, though, Your Honor, the dash cam video also showed that Mr. Bender was moving very fast. He basically hurtled this fence pretty impressively. In fact, I think there's references to that during the trial. He hurtled this fence, hurtled back over, out of it, and that's the point when he tossed the gun. Again, I think the important thing here is Judge, I'm sorry, Trupo Harcey's testimony, not just that he saw the gun, the jury could have found that he was mistaken on seeing the gun, although the jury did not find that, obviously, but Trupo Harcey also testified that he heard the gun hit the ground and he heard the gun slide across the pavement. Unless he was hallucinating, which again would be a very, very surprising conclusion for the jury to make, the jury had to find either Trupo Harcey was lying, which the jury didn't find, obviously. They credited that testimony and believed him. And the jury also watched that dash cam video a number of times and watched it again during deliberations with pausing and zooming several times. I could talk a little bit about the brain. I'd like to just add something. Certainly. The government did introduce evidence, did it not, that there was no gun on the pavement when they first arrived. Correct. When the police and Mr. Benders, the car first arrived in the area. But there was a gun after the chase. Correct. Okay. So on the Brady violation, the standard of review is also a high one for the defense to meet here. It's abuse of discretion on the overall decision. And importantly here, the standard is clear error for the district court's factual findings. So we've already talked about how, based on the position of everything and the timing of Trooper Hosselton's arrival, the judge said it would be virtually impossible for Trooper Hosselton's dash cam video to show that gun on the pavement. But again, even if it had, the important point here, the crucial dispute here is how the gun got there. Also, and so on the Brady standard, because of that factual finding, the dash cam video would not have been favorable to him for purposes of Brady, and he didn't suffer any prejudice as a result of its not being introduced. Also in relation to Brady, the government obviously did not suppress this evidence. Mr. Defense Counsel didn't ask for it until literally the eve of trial the day before, and at that point it did not exist. And so obviously, as the district court said, there could be no Brady violation for evidence that does not exist. And the fact that it didn't exist at that point is no fault of the government. It didn't show anything, so therefore it was apparently not preserved. There's also a sentencing challenge here, Your Honors, but it's a below-guideline sentence, and I believe this court has never found a below-guideline sentence to be substantively unreasonable. So we would urge the court to affirm here. Thank you. Thank you. All right. Mr. Beals. Your Honors, I would like to address a couple things in rebuttal. The first thing to address— I'm just going to give you your full five minutes. Okay. Thank you. I'd just like to address a couple things in rebuttal. The first thing I would like to address in rebuttal, the court asked the government, if the trooper's testimony was impeached by the video, would there be any other evidence? And it's the position of the defense that there wouldn't be any other evidence. Yes, there was a firearm that was entered into evidence. That firearm that was entered into evidence was— there wasn't DNA or fingerprints from my client that were found on the firearm. So yes, there was a physical firearm entered into evidence. The issue was not whether or not a firearm was entered into evidence. The issue was whether or not, at any point in time, did my client possess that firearm. And so, in looking at the actual case, and I do, as a defense, I do recognize that it is a very high standard when discussing insufficiency of the evidence. And the government is, quote, saying, well, we'd have to show that there basically was no evidence. It's the position of the defense that there was no evidence. The evidence, the main evidence in the case, was the officer's testimony. And yes, the jury—it appears the jury took the officer's testimony as credible. The question is, in this situation, in light of the actual video, where you see, as I mentioned before, the actual encounter from the point that my client exited the vehicle to the point that the officer started to tase my client. And at that point, according to the officer, my client had supposedly thrown this firearm. Now, the video itself that was entered in the evidence, the dash cam video, it didn't—the officer said that he could hear the firearm hit the pavement and skid towards the back of the vehicle, his vehicle. However, the dash cam video did not have sound where you can actually hear a firearm hitting the pavement. Furthermore, according to the trooper's testimony, and just looking at his testimony, he testified that my client grabbed the firearm from his waistband. He grabbed the firearm from his waistband as he was coming over the fence. He didn't testify that my client jumped over the fence, landed, and then grabbed the waistband—grabbed it from his waistband and threw it. The significance of that is that, once again, going into the simple laws of physics and simple laws of nature, the jury was able to look at the video. They were able to look at the video more than once. They were able to actually slow the video down. They were able to freeze frame the video. They looked at the video. They looked at my client, who did jump the fence more than once. He jumped the fence. It was an enclosure. He jumped the fence first to get into the enclosure.  It was like a light rain during that period of time. He ran to one side and was trying to jump the fence on the other side to run down an alley, and he had some issue jumping the other fence. He sees the trooper coming that way. That's correct. Actually, my client, the vehicle that was parked, was parked in a manner where it was almost as if it was pointing towards the bench. My client jumped out of the passenger side. The trooper was coming up to the side, so that's the reason why you can see my client from the point he gets out of the vehicle. When he starts to run, the trooper is following him in his vehicle. He jumps the fence the first time. At that point, the trooper gets out of his vehicle, and he starts chasing towards the other side of the fence. My client has an issue jumping the other side, so then he comes back to where he originally jumped the fence, and that's when he jumped over the fence again. You can see my client's hands. They are actually on top of the fence. As he jumps over the fence, he lands briefly, goes below the dash camera, and then jumps up and starts running. It is less than a second. Ultimately, the first time he jumped the fence, the jury was able to take a look. No protruding firearm in a waistband without a holster, and the same thing the second time, and there was nothing in his hands as he started to jump the fence. Just a couple of minor comments. I think the record shows, A, it's a chain-link fence, so we can see through the fence throughout. That's correct. Secondly, at least my view, he hurdles the first time. That's correct. He does not put his hands on the fence on the way back, which I agree is almost the same spot that he initially went over. He does put his hands on. That is correct. When he hurdled the fence, they were able to look at the video to see if there was anything protruding from his pants to show an object, and there was nothing shown. I see that I've exhausted my time. I would ask that this conviction is vacated or remanded. Thank you. Thank you. And if you would just stay there for a second, please, Mr. Beals. We want to thank you. You were appointed by the court to take this case, and we want to thank you for the vigorous and fine defense that you have given your client. You have our thanks. Thank you. And, of course, Mr. Simpson, we always thank the government as well for your vigorous arguments. And the case will be taken under advisement, and thank you both so very, very much.